IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE** ) | |
| **CORPORATION, etc.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 05-0536-WS-C |
| ) | |
| **JDC ACQUISITION CORP.,** ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter is before the Court on the plaintiff's motion for summary judgment. (Doc. 22). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 23-25, 28, 29), and the motion is ripe for resolution. After carefully considering the foregoing and other relevant materials in the file, the Court concludes that the motion for summary judgment is due to be granted.

**BACKGROUND**

In May 1991, Altus Bank was placed into receivership. Substantially all its assets were transferred to Altus Federal Savings Bank ("Altus Federal"), with the Resolution Trust Corporation ("RTC") appointed as conservator. Altus Real Estate Services, Inc. ("Altus Real Estate"), a wholly-owned subsidiary of Altus Federal, owned in turn the shares of six subsidiaries, three of which formed a partnership called the Mitchell Company. In December 1992, the RTC and Altus Real Estate agreed to sell these six subsidiaries to the defendant, including the three subsidiaries comprising the Mitchell Company.

The Stock Sale Agreement ("the Agreement") contained a provision concerning "Litigation Expenses and Recoveries," which reads in pertinent part as follows:

> The RTC and Shareholder [Altus Real Estate], jointly and severally, shall be responsible for and shall pay one-half of all litigation costs incurred or suffered by any member of The Mitchell Group [the six subsidiaries and entities they owned] on any Litigation listed on Schedule 5.4 hereto, and any related litigation that may arise between the date hereof and the Closing, which shall be identified on a supplemental schedule, and any litigation referenced in Section 5.6 hereof.  For this purpose, "litigation costs" means the fees and expenses of counsel, witness fees and expenses, court costs, and any out of pocket costs directly related to such Litigation .... Such payment or reimbursement will first be made by the RTC in accordance with the terms of the Escrow Agreement, and if funds are not available from the Escrow Agreement, then payment shall be made within thirty (30) days following submission by the Purchased Entities of written evidence reasonably satisfactory to the RTC.

(Doc. 23, Exhibit A at 38-39).  The Agreement defines "litigation" as "a court action, an administrative or regulatory action or an arbitration proceeding."  (*Id*. at 6).

The Escrow Agreement provided for the defendant to place $150,000 (part of the purchase price) with the escrow agent.  (Doc. 23, Exhibit C at 2).  The escrowed funds were to be used as a source to pay the indemnification obligations arising under Section 5.4 of the Agreement.  (*Id*. at 3-4).  Upon the conclusion of all litigation to which the indemnification obligation extended, and upon the escrow agent's receipt of certain documents from the defendant, any remaining escrowed funds were to be released to Altus Real Estate and/or RTC.  (*Id*. at 4).

Schedule 5.4 lists six specific cases then pending in state and federal court.  (Doc. 23, Exhibit B).   All six of those cases were resolved, and the indemnification obligation respecting them was satisfied, leaving funds in the escrow account.  The plaintiff alleges that the defendant has breached the Agreement and the Escrow Agreement by failing to release the escrowed funds.  The plaintiff seeks an order declaring the defendant to be in breach and directing the defendant to take the necessary steps to release the escrowed

funds to the plaintiff.  (Doc. 1 at 4-5).[1]

Closing occurred in February 2003.  Two additional lawsuits were filed after closing: one brought by the Mitchell Company in 1995 against its former CFO ("*Weber*") and one brought in 1994 against the Mitchell Company ("*Garlen*").  The defendant argues that the litigation costs incurred in connection with the *Weber* and *Garlen* actions fall within the indemnification obligation of Section 5.4.  Because half of these litigation costs exceed the balance in the escrow account, and because it seeks interest on these unreimbursed costs, the defendant in its counterclaim requests both a declaration that it is entitled to the funds on escrow and an order directing the plaintiff to pay the defendant the additional funds it seeks.  (Doc. 7 at 4-6).[2]

The plaintiff seeks summary judgment both on its claim and on the counterclaim of the defendant.  The controlling question, according to both parties, is whether the indemnification obligation of Section 5.4 extends to the *Weber* and *Garlen* lawsuits.  Each side insists that the Agreement unambiguously supports its position.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 12 U.S.C. § 1819(b)(2) and 28 U.S.C. §§ 1331 and 1345.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[1] The defendant does not dispute that the plaintiff is the successor in interest to Altus Real Estate and the RTC with respect to the escrowed funds.

[2] While the precise amount at issue is uncertain, the plaintiff represents the balance in the escrow account as of September 2005 to be approximately $228,000.  (Doc. 1 at 4, ¶ 14).  The defendant asserts that one-half of its litigation costs incurred in connection with the *Weber* and *Garlen* cases exceeds $375,000, with interest on that amount accruing at an annual rate of 10% since March 1999.  (Doc. 7 at 6, ¶ 8).

56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

The Agreement provides that it is to be construed under Alabama law, (Doc. 23, Exhibit A at 62), and the parties agree that Alabama law controls.  (Doc. 23 at 4; Doc. 28 at 8).  "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide."  *American Resources Insurance Co. v. H & H Stephens Construction, Inc*., 939 So. 2d 868, 873 (Ala. 2006).  "A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning."  *FabArc Steel Supply, Inc. v. Composite Construction Systems, Inc*., 914 So. 2d 344, 357 (Ala. 2005).  Conversely, "[a] document is unambiguous if only one reasonable meaning emerges from a reading of the document."  *Drummond Co. v. Walter Industries, Inc.*, 2006 WL 3462146 at *24 (Ala. 2006).

Section 5.4 imposes an indemnification obligation on three categories:
- "Litigation listed on Schedule 5.4";
- "any related litigation that may arise between the date hereof and the Closing, which shall be identified on a supplemental schedule"; and
- "any litigation referenced in Section 5.6 hereof."

Section 5.6 concerns refinancing, (Doc. 23, Exhibit A at 40-41), and is not in play.  The *Weber* and *Garlen* lawsuits were not "litigation" at the time of closing, and no supplemental schedule was prepared that identified them.  The defendant admits that the

*Weber* and *Garlen* lawsuits "are certainly not new 'litigation' that arose prior to closing." (Doc. 28 at 9, ¶ 36). Finally, the *Weber* and *Garlen* lawsuits (since they did not then exist) are not listed on Schedule 5.4. Thus, by the plain and unambiguous terms of the Agreement, the indemnification obligation does not extend to them. The defendant advances a creative but futile argument in an effort to avoid this clear result.

The argument rests on several premises. First, that the *Weber* and *Garlen* lawsuits are related to the six scheduled lawsuits. With respect to *Weber*, the defendant points out that it was brought by the Mitchell Company (after its purchase by the defendant) in response to Weber's failure to abide by the terms of the settlement and release executed in connection with one of the six scheduled lawsuits. (*Id*. at 5-6, ¶ 16; *id*., Exhibit 3 at 4-5). With respect to both *Weber* and *Garlen*, the defendant notes that these cases, like all six scheduled lawsuits, involved as a party (sometimes plaintiff, sometimes defendant) either Weber or a business partner, family member, or friend of his. (Doc. 28 at 3-4, ¶¶ 7-8; *id*. at 5-6, ¶¶ 16-17).

The second premise is that the parties recognized, at the time they entered the Agreement, that the combative Weber posed continuing "risks" of litigation and that they intended to protect the defendant against such risks. (Doc. 28 at 9, ¶ 35). This premise is based on the affidavit of Paul Charles Wesch, who asserts — without support or explanation and using a vague, passive voice — that when the Agreement was entered, "it was intended that the RTC and Altus Real Estate would indemnify JDC one-half of all litigation costs which were directly related to litigation instituted by or on behalf of Mr. Julius W. Weber, including those cases which were currently pending and [scheduled] and any subsequent litigation costs directly related to Mr. Weber's claims and/or legal actions." (*Id*., Exhibit 1 at 4, ¶ 10).

The third premise of the defendant's argument is that the *Garlen* suit involved a breach of Section 3.8 of the Agreement, which states that the Mitchell Group owns the property purchased by the defendant free and clear of "all ... adverse claims ... of any

nature whatsoever ... including any arising from existing or threatened litigation ...." (Doc. 23, Exhibit A at 24-25). The defendant explains that the *Garlen* lawsuit challenged practices of the Mitchell Company that preceded the defendant's purchase and notes that Section 6.4 of the Agreement entitles it to indemnity for breaches of warranty and inaccurate representations. (Doc. 28 at 6, ¶ 17).

With respect to the defendant's first premise, the Court accepts that the *Weber* and *Garlen* lawsuits are not totally divorced from the six scheduled lawsuits, but it finds no connection relevant to Section 5.4. The defendant emphasizes the provision's coverage of "litigation costs" incurred "on" the scheduled cases, with such costs including costs "directly related" to the scheduled cases. The defendant argues that (but does not explain how) the use of "on" rather than "in," and of "directly related" rather than "directly incurred," extends the indemnification obligation to future, non-scheduled lawsuits. (Doc. 28 at 8-9, ¶¶ 32-36).

This argument will not withstand a review of the contractual language on which it depends. The only "litigation costs" to which the indemnification obligation extends are those incurred on the six specific items of "Litigation" listed on Schedule 5.4. "Litigation" is a defined term and means "a court action, an administrative or regulatory action or an arbitration proceeding." (Doc. 23, Exhibit 1 at 6). The *Weber* and *Garlen* lawsuits were not, and could not possibly be, part of the same "litigation" — i.e., the same lawsuit — as the six scheduled cases, since *Weber* and *Garlen* were filed separately from, and were never consolidated with, any of the six scheduled cases. Whatever their connection in terms of parties or even subject matter (and this is more tenuous than the defendant admits), *Weber* and *Garlen* were separate "court action[s]" and thus not part of the "litigation" to which the indemnity obligation extends. Costs incurred on *Weber* and *Garlen* cannot possibly be costs incurred on the six scheduled cases, and the Agreement is unambiguous in this regard.

With respect to the defendant's second premise, extrinsic evidence of the parties'

intent cannot be injected without first establishing that the contractual language is ambiguous.  This the defendant has failed to do.

With respect to its third premise, the defendant has identified no evidence that the *Garlen* lawsuit was "threatened" before the date of closing; that the factual predicate for such a claim may have existed before closing is irrelevant.  More fundamentally, even if RTC and/or Altus Real Estate misrepresented the absence of any threatened litigation, the defendant's remedy would be to invoke the indemnity provision of Section 6.4; it would not be to rewrite Section 5.4.[3]

Because the indemnification requirement of Section 5.4 unambiguously does not extend to the *Weber* and *Garlen* lawsuits, the plaintiff is entitled to summary judgment both on its claim and on the defendant's counterclaim.  Accordingly, and for the reasons set forth above, the plaintiff's motion for summary judgment is **granted**.  The Court declares that the defendant is in breach of the Agreement and Escrow Agreement.  The defendant is **ordered** to execute the instructions and other documents necessary to effect the release of the escrowed funds to the plaintiff.

DONE and ORDERED this 28th day of March, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[3] The defendant's counterclaim seeks relief exclusively based on Section 5.4.  (Doc. 7 at 4-6).